**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

VIRTUS PHARMACEUTICALS, LLC,

       Plaintiff,

v.                                Case No: 8:21-cv-2427-WFJ-SPF

WOODFIELD DISTRIBUTION, LLC;
WOODFIELD PHARMACEUTICAL, LLC;
and ADAM RUNSDORF,

       Defendants.

_____/

## ORDER

Before the Court today are the following three motions: (1) a Motion to Dismiss by Defendant Adam Runsdorf, Dkt. 39; (2) a Motion to Dismiss by Defendant Woodfield Distribution LLC ("Woodfield Distribution"), Dkt. 40; and (3) a Motion to Dismiss by Defendant Woodfield Pharmaceutical LLC ("Woodfield Pharmaceutical"), Dkt. 41. Plaintiff Virtus Pharmaceuticals LLC ("Virtus") filed an omnibus response to the three motions. Dkt. 44. Having thoroughly reviewed the record and relevant case law, the Court denies the motions because Plaintiff Virtus adequately states its claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## BACKGROUND

The Court recites the following facts as alleged in Plaintiff's Second Amended Complaint. Dkt. 38.

### I.    The Services Agreement

Plaintiff Virtus is a "virtual" drug manufacturer. It owns the applications necessary to produce pharmaceuticals regulated under the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*. *Id.* at 4. But Virtus itself is not registered with the United States Drug Enforcement Agency ("DEA") to physically handle controlled substances. *Id.* This means Virtus must outsource its manufacturing and distribution operations to third-party contractors with valid DEA registrations. *Id.* Although Virtus maintains ownership over its drugs, third-party contractors handle the packaging, warehousing, transportation, and distribution of them. *Id.*

In 2017, Virtus hired Defendant Woodfield Distribution—which held the necessary DEA registrations to handle pharmaceutical products regulated under the CSA—to manage Virtus's pharmaceutical inventory at facilities in Sugar Land, Texas, and Boca Raton, Florida. *Id.* at 11. Woodfield Distribution agreed to store and distribute several Virtus products, including levorphanol, codeine, phendimetrazine, tramadol, and virtussin—all of which are controlled substances regulated under the CSA. *Id.* Virtus retained title over the drugs while they were stored at Woodfield Distribution's facilities.

2

Virtus and Woodfield Distribution entered into a contract ("the Services Agreement") to memorialize their deal. *Id.* Woodfield Distribution agreed to the following obligations:

- Provide inventory management and distribution services to Virtus at "commercially reasonable standards";

- "Comply with all applicable federal and state laws, regulations, and rules . . . including . . . those relating to the . . . U.S. Drug Enforcement Administration";

- Maintain all "necessary permits, licenses, and other federal . . . authorizations" required to discharge its contractual services for Virtus;

- Notify Virtus within five business days if Woodfield Distribution receives notice from a federal or state agency regarding its noncompliance with applicable regulations;

- Immediately notify Virtus if Woodfield Distribution receives notice of an inspection or audit by a governmental agency;

- Maintain complete and accurate records in compliance with state and federal law;

- Defend and indemnify Virtus against third-party losses associated with any cease of distribution of Virtus's products.

*Id.* at 11–14.

Defendant Adam Runsdorf is the president and sole owner of Woodfield Distribution. *Id.* at 5. He signed the Services Agreement on behalf of Woodfield Distribution. *Id.* at 14. Mr. Runsdorf is also the president and sole owner of Defendant Woodfield Pharmaceutical—a manufacturer of pharmaceutical drug

3

products. *Id.* at 5. Only Woodfield Distribution signed the Services Agreement with Virtus; Woodfield Pharmaceutical was not a party to the contract.

## II.    DEA Order to Show Cause

In August 2021, the DEA issued an Order to Show Cause (the "DEA Order") calling for the immediate suspension of DEA registrations held by Woodfield Distribution and Woodfield Pharmaceutical. *Id.* at 14. The DEA concluded that Woodfield Distribution "manifestly failed to comply with its obligation to maintain effective controls against the diversion of controlled substances." *Id.* at 15. Concerning Woodfield Pharmaceutical, the DEA found "that significant quantities of controlled substances were removed from [Woodfield Pharmaceutical] without proper documentation or accounting and that [Woodfield Pharmaceutical] had connections to a suspected drug trafficking organization." *Id.* at 21. The DEA concluded that public health and safety would be endangered if the Woodfield entities continued to use their DEA registrations. *Id.* at 14.

The DEA described Woodfield Distribution and Woodfield Pharmaceutical as "related entities" that "share common ownership." *Id.* at 15. The DEA further stated that Mr. Runsdorf "exercises significant influence and control" over both companies. *Id.* Because of this high level of control over both Woodfield Distribution and Woodfield Pharmaceutical, the DEA found that the "misconduct

4

of either entity is relevant to the determination of whether the other can be entrusted with a DEA registration." *Id.* at 22 (citing Dkt. 38-3 ¶ 60).

The DEA issued an immediate suspension of the Woodfield entities' DEA registrations. *Id.* at 24. It based this determination on the following four categories of alleged misconduct:

*1. Recordkeeping*

First, the DEA found that Woodfield Distribution and Woodfield Pharmaceutical failed to maintain adequate records of the controlled substances in their inventories. *Id.* at 15–16; 21. An audit performed by the DEA revealed that Woodfield Distribution could not account for: (1) more than 67 million dosage units of tramadol 50 mg, a Schedule IV controlled substance; (2) more than 5 million dosage units of phendimetrazine 35 mg, a Schedule III controlled substance; (3) more than 375,000 dosages of phendimetrazine 105 mg, a Schedule III controlled substance; and (4) more than 285,000 dosage units of levorphanol 2 mg, a Schedule II controlled substance. *Id.* at 15–16.

In January 2019, a burglary occurred at a Woodfield Distribution warehouse. *Id.* at 16. The thieves stole more than 217,000 dosage units of alprazolam, a Schedule IV controlled substance. *Id.* Although Woodfield Distribution was obligated to file theft and loss reports with the DEA, Woodfield Distribution never informed the agency about the burglary. *Id.*

Woodfield Distribution also failed to notify the DEA about lost shipments. *Id.* Between January 2019 and March 2020, Woodfield Distribution could not account for at least 45 shipments of controlled substances. *Id.* But Woodfield Distribution notified the DEA about only one lost shipment. *Id.* "Woodfield Distribution therefore failed to report at least 44 shipments with missing controlled substances totaling hundreds of thousands of dosage units." *Id.* (quoting Dkt. 38-3 ¶ 16). This failure to report continued even after the DEA inspected Woodfield facilities in March 2020. *Id.* at 17.

Additionally, in October 2019, two Woodfield Pharmaceutical employees removed codeine, a Schedule II controlled substance, from the controlled substances vault at a Woodfield Pharmaceutical facility after business hours. *Id.* at 21. The employees did not document their removal of the controlled substance from the vault. *Id.* They instead falsely documented that they removed only a "Data Logger." *Id.* Although Woodfield Pharmaceutical discovered this falsification through video recordings from its security system, Woodfield Pharmaceutical never meaningfully disciplined the employees, and the employees remained employed at Woodfield Pharmaceutical. *Id.* at 21–22.

2. *Suspicious Orders*

Second, the DEA found that the Woodfield entities failed to report instances of suspicious orders. *Id.* at 17−18. As DEA registrants, the Woodfield entities had

6

an obligation to operate systems that identified suspicious orders. 21 U.S.C. §
832(a)(1). Orders may be suspicious if they involve unusual quantities, deviate
from normal ordering patterns, or are made with unusual frequency. *Id*. § 802(57);
*see also* 21 C.F.R. § 1301.74(b).

From at least April 2018 to August 2021, Woodfield Distribution did not
report any orders as suspicious to the DEA. Dkt. 38 at 17. But the DEA discovered
during its investigation that thousands of orders should have been flagged as
suspicious according to Woodfield's internal criteria for suspicion. *Id.* at 17−18.
The DEA "identified 995 instances where Woodfield Distribution filled an order
for a controlled substance for a customer who had placed an order for the same
quantity of the same product in the previous seven days." Dkt. 38-3 ¶ 37. And the
DEA "identified 1,190 instances where Woodfield filled an order for a controlled
substance that exceeded two times the monthly average of orders for that product
distributed to that customer." *Id*. ¶ 38. For at least ten percent of those orders, the
company distributed more than five times the monthly average of controlled
substances purchased by the customer. Dkt. 38 at 18. These failures led the DEA to
conclude that Woodfield Distribution violated its internal reporting procedures and
its regulatory reporting obligations. *Id.*

### 3. Physical Security

Third, the DEA found that the Woodfield entities failed to maintain adequate physical security for the Texas warehouses. *Id.* at 18–20. DEA registrants must store certain controlled substances in secure areas equipped with alarm systems. 21 C.F.R. § 1301.72(b)(4)(v). However, the DEA's investigation revealed that Woodfield Distribution employees routinely bypassed the alarm system for a cage where controlled substances were stored. Dkt. 38 at 19. During a five-month period between March and September 2020, Woodfield Distribution employees bypassed the alarm system more than 120 times, despite the DEA's contrary warnings. *Id.*

DEA registrants must also store controlled substances behind locked doors and limit which employees have keys to access the substances. 21 C.F.R. § 1302.72(b)(3)(ii)(a). In March 2020, Woodfield Distribution's cage for controlled substances was "broken and could not be locked." Dkt. 38 at 20 (citing Dkt. 38-3 ¶ 42). The company later put a padlock on the door, but the key to the lock was "kept on a table next to the door in an unsupervised, unsecured box in plain view." *Id.*

### 4. Connections to Drug Trafficking

Finally, the DEA stated that Mr. Runsdorf and Woodfield Pharmaceutical "had connections to a suspected drug trafficking organization." *Id.* at 22 (citing Dkt. 38-3 ¶ 45). In February 2021, the DEA received a tip from a confidential source that Woodfield Pharmaceutical "planned to deliver hundreds of gallons of

8

suspected promethazine," an antihistamine that strengthens the opioid high when abused. *Id.* (citing Dkt. 38-3 ¶ 53). The source had observed Woodfield Pharmaceutical employees loading a truck with 55-gallon drums of the suspected substance. *Id.* DEA investigators then followed the truck to a warehouse leased by a member of the suspected drug-trafficking organization. *Id.* At the warehouse, the DEA observed members of the suspected drug-trafficking organization offloading the same drums the confidential source had identified. *Id.* at 22–23.

The following day, the DEA executed a search warrant at the warehouse and discovered the 55-gallon drums of suspected promethazine, "as well as drug trafficking paraphernalia, including, but not limited to, [thirty-six] 55-gallon drums; 291 bottles containing suspected promethazine; approximately 45,000 counterfeit labels for either promethazine or promethazine with codeine, a Schedule V controlled substance; a volumetric filling machine; capping machines; and a pill press." *Id.* at 23 (citing Dkt. 38-3 ¶ 54). Almost a week later, the DEA seized a package containing $7,000 that was sent to Mr. Runsdorf by a suspected member of the drug trafficking organization. *Id.*

Mr. Runsdorf had previously requested that the drug-trafficking organization only pay him in cash. *Id.* at 37. He stated he would no longer accept personal checks or wire transfers into his personal bank accounts. *Id.* at 37. Mr. Runsdorf also requested that the drug-trafficking organization "increase its business with

9

Woodfield by ordering more 'baches' of the promethazine syrup product on a more frequent basis." *Id.* To solidify this business, a member of the drug-trafficking organization paid Mr. Runsdorf $30,000. *Id.* This led Mr. Runsdorf to become more "hands-on" with the drug-trafficking organization. *Id.*

Mr. Runsdorf instructed Woodfield employees to comply with the drug-trafficking organization's requests, including a request to make the organization's products indistinguishable from legitimate promethazine syrup products. *Id.* at 38. Co-conspirators bottled and packaged promethazine syrup with counterfeit marks inside Woodfield Pharmaceutical's facilities. *Id.* Members of the drug-trafficking organization met with Mr. Runsdorf several times at Woodfield facilities. *Id.* Members of the drug-trafficking organization even produced a promotional video inside Woodfield Pharmaceutical's manufacturing facility. *Id.* In total, the counterfeit scheme garnered more than $52 million in cash proceeds. *Id.* at 38.

### III.   Administrative and Criminal Proceedings

On August 11, 2021, the DEA suspended the registrations held by Woodfield Distribution and Woodfield Pharmaceutical for their failure to maintain effective controls against the diversion of controlled substances.[1] *Id.* at 24. The

---

[1] Where a registrant poses "an imminent danger to public health or safety," the CSA authorizes the immediate suspension of that entity's registration. 21 U.S.C. § 824(d)(1). Such an "imminent threat to public health and safety" exists where a registrant's conduct presents "a substantial likelihood of an immediate threat that death, serious bodily harm, or abuse of a controlled substance will occur in the absence of an immediate suspension of the registration." *Id.* § 824(d)(2).

DEA concluded that the continued use of Woodfield Distribution's and Woodfield Pharmaceutical's DEA registrations constituted an imminent danger to public health and safety. *Id.* Both Woodfield entities voluntarily surrendered their DEA Certificates of Registration. *Id.*

The DEA seized all controlled substances at Woodfield Distribution's warehouse in Sugar Land, Texas, including pharmaceutical products owned by Virtus. *Id.* The DEA continues to hold these controlled substances—including Virtus products—in an undisclosed location. *Id.*

In November 2021, a federal grand jury in Texas returned a three-count indictment charging nine individuals with conspiracy, trafficking in drugs with a counterfeit mark, and conspiracy to commit money laundering. *Id.* The indicted individuals included members of the Houston drug-trafficking organization and four Woodfield Pharmaceutical employees. *Id.* Authorities arrested Mr. Runsdorf soon after. *Id.* at 24–25. The Texas grand jury returned a superseding indictment adding Mr. Runsdorf in February 2022. *Id.* at 25; Dkt. 38-2. The indictment alleges ten individuals committed conspiracy in violation of 18 U.S.C. § 371, trafficking in drugs with counterfeit mark in violation of 18 U.S.C. § 2320(a)(4), and conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). Dkt. 38 at 25.

## IV.     Virtus's Recovery Efforts

In August 2021, Virtus contacted the DEA requesting the return of its products, which included levorphanol, phendimetrazine, tramadol, and virtussin. *Id.* Despite Virtus renewing its request several times, the DEA refused to release the Virtus products. *Id.*

Virtus then sued the DEA in the United States District Court for the District of Columbia. *Id.* Virtus requested a temporary restraining order compelling the DEA to release Virtus's drug supply to a new third-party distributor so that Virtus could resume its sales operations for those drugs. *Id.* at 25–26. The district court ultimately denied Virtus's motion for a temporary restraining order. *See Virtus Pharms., LLC v. Garland*, No. 21-2308-CKK, 2021 WL 4306165 (D.D.C. Sept. 22, 2021). Virtus has not yet recovered its products seized by the DEA.

## V.     The Instant Case

Plaintiff Virtus filed the operative complaint (the "Second Amended Complaint") against Defendants Woodfield Distribution, Woodfield Pharmaceutical, and Mr. Runsdorf in February 2022. Dkt. 38. Virtus brings four claims against all Defendants.

First, Virtus alleges Defendants violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c). *Id.* at 30–41. According to Virtus—from April 2014 through August 2021—Mr. Runsdorf, the

Woodfield Defendants, and other members of an alleged enterprise laundered money and trafficked counterfeit controlled substances in the black market. *Id.* at 38−41. Virtus alleges these RICO violations led the DEA to seize its products from Woodfield facilities, thereby causing Virtus to lose tens of millions of dollars of product. *Id.* at 41. Virtus also alleges the DEA seizure caused it to lose goodwill with its customers, exposed it to several contractual disputes, and caused it to breach financial covenants with lenders given its lack of cash flow. *Id.* at 27–29.

Second, Virtus alleges Defendants conspired to engage in racketeering activity, in violation of 18 U.S.C. § 1962(d). *Id.* at 42–43. Virtus relies on the same factual allegations from Count One to plead Count Two.

Third, Virtus alleges Defendant Woodfield Distribution breached several provisions of the Services Agreement, including but not limited to: (1) failing to provide Virtus services that met commercially reasonable standards; (2) failing to maintain its DEA registrations and to comply with all applicable federal and state laws; (3) failing to maintain complete and accurate records in compliance with all applicable regulations; (4) failing to properly notify Virtus about the DEA's inspections and audits; (5) failing to indemnify Virtus for third-party losses and liabilities stemming from its failure to distribute Virtus's products; and (6) failing to satisfy insurance requirements. *Id.* at 43–44. Virtus alleges these contract breaches caused it to lose millions of dollars. *Id.* at 45. Although Virtus entered

into the Services Agreement with only Woodfield Distribution, Virtus nevertheless argues Woodfield Pharmaceutical and Mr. Runsdorf may be held liable under a veil piercing/alter ego theory. *Id.* at 45–46.

Finally, Virtus alleges all Defendants breached the implied covenant of good faith and dealing. *Id.* at 46–47. Virtus relies on the same factual allegations from Count Three to plead Count Four. According to Virtus, "Defendants' actions unfairly frustrated the agreed common purpose of the Services Agreement, disappointed Virtus's reasonable expectations, and deprived Virtus of the benefits of the agreement." *Id.* at 47. Recognizing it only had a contract with Woodfield Distribution, Virtus again relies on a veil piercing/alter ego theory to bring these claims against Woodfield Pharmaceutical and Mr. Runsdorf. *Id.*

All Defendants move to dismiss the Second Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[2] Dkts. 39, 40, 41. The Court address these motions below.

## **LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff must plead sufficient facts to state a claim that is plausible on its face.

---

[2] Defendant Woodfield Pharmaceuticals also argues the Court should dismiss it from this action because Plaintiff Virtus improperly added it as a defendant in the Second Amended Complaint. Dkt. 41 at 2–3. But Rule 21 of the Federal Rules of Civil Procedure allows the Court to exercise its discretion to add parties to a case at any time. The Court chooses to do so here in the interest of judicial economy.

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard does not require detailed factual allegations but demands more than unadorned accusations. *Id*. A plaintiff's complaint must also "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering a Rule 12(b)(6) motion to dismiss, a complaint's factual allegations are accepted as true and construed in the light most favorable to the plaintiff. *Pielage v. McConnell*, 516 F.3d 1282, 1284 (11th Cir. 2008).

## **ANALYSIS**

### I.     **Civil RICO Claim**

Section 1962(c) of RICO makes it unlawful "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In addition to RICO's criminal proscriptions, a private plaintiff may file a civil lawsuit seeking redress for injuries to its business caused by another's RICO violations. *Id.* § 1964(c). A private plaintiff suing under the civil provisions of RICO must plausibly allege the following six elements: the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the

15

plaintiff. *See Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020)

(citing *Ray v. Spirit Airlines*, 836 F.3d 1340, 1348 (11th Cir. 2016)).

Here, the Woodfield Defendants and Mr. Runsdorf attack almost every

element of the civil RICO claim against them, arguing Virtus fails to provide well-

pleaded factual content as required under Rule 12(b)(6). The Court disagrees. As

further explained below, the Second Amended Complaint provides a detailed

sequence of events that describes how all Defendants allegedly directed,

controlled, or participated in the alleged RICO enterprise.

### 1.  Existence of an Enterprise

The RICO statute defines "enterprise" as "any individual, partnership,

corporation, association, or other legal entity, and any union or group of

individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Here, Virtus alleges Defendants constituted "an associated-in-fact enterprise," Dkt.

38 at 4, which is defined as "a group of persons associated together for a common

purpose of engaging in a course of conduct," *United States v. Turkette*, 452 U.S.

576, 583 (1981). This is a broad definition; "the very concept of an association in

fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009) (citations

omitted). An associated-in-fact enterprise can be either "formal or informal," so

long as the enterprise's "various associates function as a continuing unit." *Almanza

v. United Airlines, Inc.*, 851 F.3d 1060, 1067 (11th Cir. 2017) (citing *Turkette*, 452

16

U.S. at 583). To constitute an associated-in-fact enterprise, the group must have three structural features: (1) a common purpose that is criminal in nature, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit the enterprise associates to pursue the common purpose. *Id.* Plaintiff Virtus adequately establishes each of these structural features at this early stage of litigation.

First, Plaintiff Virtus adequately alleges that the enterprise had a common purpose that was criminal in nature. Under the purpose prong, it is not enough to allege an abstract common purpose, such as a general shared interest in making money. *Cisneros*, 972 F.3d at 1211. Rather, where an association's ultimate purpose is to make money for its participants, a RICO plaintiff must plausibly allege the participants shared the purpose of enriching themselves through a particular criminal course of conduct. *Id*.

Here, Plaintiff Virtus alleges Defendants acted collectively to enrich themselves through the illegal distribution and trafficking of controlled substances and counterfeit drugs.[3] To achieve this purpose, Defendants allegedly engaged in repeated criminal activity over the course of seven years, including money

---

[3] Although Defendants purportedly had a relationship that predates the alleged criminal schemes—*i.e.*, their legitimate business ventures—this does not prevent a finding that Defendants later formed a RICO enterprise. *See Al-Rayes v. Willingham*, 914 F.3d 1302, 1308 (11th Cir. 2019) (holding that association-in-fact enterprises may consist of parties who had preexisting relationships and later joined together for the common purpose of engaging in illegal activity).

laundering, delivering controlled substances to a suspected drug-trafficking organization, labeling those controlled substances with counterfeit labels, and obscuring the fact that thousands of doses of controlled substances were stolen or missing. Virtus alleges this illegal scheme garnered more than $52 million in cash proceeds. Dkt. 38 at 38. These factual allegations satisfy the purpose prong at this stage of the case. *See United States v. Starrett*, 55 F.3d 1525, 1545 (11th Cir. 1995) (explaining that "an association's devotion to making money from repeated criminal activity demonstrates an enterprise's common purpose of engaging in a course of conduct") (cleaned up).

Second, Plaintiff Virtus adequately alleges "relationships among those associated with the enterprise." Proving sufficient relationships for an associated-in-fact enterprise is not a particularly demanding task. *Almanza*, 851 F.3d at 1068. An associated-in-fact enterprise "need not have a hierarchical structure or a 'chain of command,'" nor do members of the enterprise need to have fixed roles. *Id.* (citing *Boyle*, 556 U.S. at 948). The enterprise does not need to have "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* Instead, "the critical determination in evaluating whether an association of individual entities constitutes a RICO enterprise is whether the association of individual entities, however loose or informal, furnished a vehicle for the commission of two or more predicate crimes."

18

*Lockheed Martin Corp. v. Boeing Co.*, 357 F. Supp. 2d 1350, 1360 (M.D. Fla. 2005) (quoting *United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1275 (11th Cir. 2000)) (cleaned up).

Here, Plaintiff Virtus adequately alleges that Woodfield Distribution, Woodfield Pharmaceutical, and Mr. Runsdorf all functioned as a continuing unit to enrich themselves through the illegal distribution and trafficking of counterfeit controlled substances.[4] According to the Second Amended Complaint, Mr. Runsdorf used Woodfield Pharmaceutical's manufacturing facilities to divert controlled substances into the black market. Dkt. 38 at 35. Woodfield Pharmaceutical employees delivered 55-gallon drums of controlled substances to a warehouse leased by a member of a suspected drug-trafficking organization. *Id.* at 22. Mr. Runsdorf allegedly earned $7,000 from this transaction.[5] *Id.* at 23. Moreover, Woodfield Distribution allegedly failed to maintain effective controls

---

[4] Indeed, in its Order to Show Cause, the DEA stated that Mr. Runsdorf's significant control over each Woodfield entity rendered the "misconduct of either entity . . . relevant to the determination of whether the other can be entrusted with a DEA registration." Dkt. 38 at 22; Dkt 38-3 ¶ 59.

[5]     It is well established that a RICO enterprise must be an entity separate and distinct from any individual defendant—a person cannot conspire with himself. *Cisneros*, 972 F.3d at 1215 (citing *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)). Thus, "plaintiffs may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation." *Ray*, 836 F.3d at 1357.

    However, this "distinctness" requirement can still be satisfied when a corporate employee allegedly conducts the corporation's affairs in a way forbidden under RICO. *Cedric Kushner*, 533 U.S. at 163. This is because "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status." *Id.*

against the diversion of controlled substances into illicit channels. These failures include: (1) failing to notify the DEA that it lost thousands of dosage units of controlled substances; (2) failing to report thousands of orders for controlled substances as suspicious; and (3) failing to maintain physical safety requirements at its facilities, including working alarm systems and key locks. According to Virtus, these failures helped facilitate the enterprise's common purpose of earning money though the illicit diversion of controlled substances into the black market. These factual allegations adequately establish that Defendants had sufficient relationships to constitute an associated-in-fact enterprise.

Finally, Plaintiff Virtus adequately alleges the longevity requirement. According to the Second Amended Complaint, Defendants pursued the enterprise's criminal purpose for at least seven years. Dkt. 38 at 38. This is enough at this stage of the litigation. *See United States v. Pierce*, 785 F.3d 832, 838 (2d Cir. 2015) (stating there is no hard-and-fast time period that satisfies this requirement).

In sum, Plaintiff Virtus adequately alleges every element of a RICO enterprise. The Second Amended Complaint cannot be dismissed on this basis.

### 2. *Management of the Enterprise*

The Woodfield Defendants and Mr. Runsdorf argue that even if there is an actionable RICO enterprise, the Second Amended Complaint lacks sufficient factual allegations showing they managed the enterprise.

To conduct or participate, directly or indirectly, in the conduct of a RICO enterprise's affairs, one must participate in the operation or management of the enterprise itself. *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (quoting 18 U.S.C. § 1962(c)). RICO liability is not limited to those with primary responsibility for the enterprise. *Starrett*, 55 F.3d at 1542. The plaintiff need only adequately allege the defendant had "some part in directing [the] affairs" of the alleged enterprise. *Id.* (quoting *Reves*, 507 U.S. at 179).

According to the facts alleged in the Second Amended Complaint, it can be reasonably inferred that each Defendant exercised some measure of control over the RICO enterprise. *See Lockheed Martin*, 357 F. Supp. 2d at 1360 (stating the proper inquiry in the dismissal context is whether the complaint creates a reasonable inference the defendants exercised some measure of control over the RICO enterprise). Mr. Runsdorf allegedly used both Woodfield Pharmaceutical and Woodfield Distribution to divert controlled substances into the black market. Dkt. 38 at 36; Dkt. 44 at 22. Woodfield Pharmaceutical and Woodfield Distribution failed to notify the DEA that thousands of doses of controlled substances were missing or stolen from their facilities, including at least one circumstance wherein Woodfield employees were the thieves themselves. Dkt. 38 at 16–17, 21. These omissions allowed the alleged illegal diversion scheme to continue undetected for several years.

Contrary to Woodfield Distribution's arguments, Dkt. 40 at 5–6 (citing *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392 (7th Cir. 2009)), these are not innocent, run-of-the-mill business interactions with an enterprise. Nor do these interactions constitute tangential involvement with an enterprise. *See id.* Virtus's allegations—accepted as true at this stage of the litigation—plausibly establish how each Defendant had some part in directing the illegal diversion of controlled substances into the black market.

### 3. Racketeering Activity

An act of racketeering is commonly referred to as a "predicate act." *Maiz v. Virani*, 253 F.3d 641, 671 (11th Cir. 2001) (quotation marks omitted). A plaintiff must put forth enough facts with respect to each predicate act to make it independently indictable as a crime. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997). The RICO statute defines "racketeering activity" to include "any act which is indictable" under a long list of criminal provisions. *See* 18 U.S.C. § 1961(1).

The first predicate act alleged by Plaintiff Virtus is money laundering. Dkt. 44 at 6–7. Money laundering is explicitly listed as a predicate act in RICO. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" as actions that are indictable under money laundering laws). According to the Second Amended Complaint, Mr. Runsdorf told the leader of a drug-trafficking organization that he would accept

future payments only in the form of cash; he would no longer accept checks or wire transfers to his personal account. Dkt. 38 at 37. Members of the drug-trafficking organization allegedly dropped off the cash payments at a Woodfield facility in Texas. *Id.* A Woodfield employee would then mail the cash payments to Mr. Runsdorf in Florida. *Id.* The scheme allegedly generated more than $52 million in cash proceeds. *Id.* at 38. These allegations—accepted as true at this stage—adequately establish money laundering as an actionable predicate act. *See* 18 U.S.C. § 1956(a)(3) ("Whoever, with the intent . . . to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity . . . conducts or attempts to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity . . . shall be fined under this title or imprisoned for not more than 20 years, or both.").

The second predicate act alleged by Plaintiff Virtus is trafficking counterfeit goods. Dkt. 38 at 38−40; Dkt. 44 at 15–16. This crime is also explicitly listed as a predicate act in RICO. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" as actions that are indictable under laws for trafficking counterfeit goods). The Second Amended Complaint alleges Defendants and other members of the RICO enterprise knowingly trafficked drugs with counterfeit marks. Dkt. 38 at 41. Mr. Runsdorf allegedly partnered with a Houston drug-trafficking organization to

traffic misbranded and counterfeit drugs. *Id.* at 5–6. Mr. Runsdorf allegedly used Woodfield employees and facilities to do so. *Id.* The DEA also discovered approximately 45,000 counterfeit labels for promethazine with codeine—a Schedule V controlled substance—when searching a warehouse that contained 55-gallon drums of promethazine delivered by Woodfield Pharmaceutical employees. *Id.* at 23. As such, Plaintiff Virtus adequately alleges trafficking counterfeit goods as a predicate act.

### 4. Pattern

According to Defendants, even if Plaintiff Virtus properly alleges racketeering activity, it fails to allege with sufficient particularity that Defendants engaged in a *pattern* of racketeering activity.

To successfully allege a pattern of racketeering activity, a plaintiff must allege: (1) the defendants committed two or more predicate acts within a ten-year time span; (2) the predicate acts are related to one another; and (3) the predicate acts demonstrate a continuing nature of criminal conduct. *H.J., Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239–43 (1989); *Jackson v. Bellsouth Tel., Inc.*, 372 F.3d 1250, 1265 (11th Cir. 2004). Continuity may be established when the defendant engaged in repeated predicate acts over a closed but substantial period of time that demonstrates a defendant's long-term criminal activity. *H.J. Inc.*, 492 U.S. at 241–

42. A "substantial period of time" is measured by years, not weeks. *Jackson*, 372 F.3d at 1264.

Here, Plaintiff Virtus adequately alleges Defendants engaged in a pattern of racketeering activities. Defendants' RICO scheme allegedly lasted seven years and generated over $52 million. Dkt. 38 at 38. Plaintiff Virtus alleges this scheme consisted of numerous instances of money laundering and numerous transactions involving the sale of controlled substances with counterfeit marks. *Id.* According to Virtus, Defendants directly engaged in a pattern of illicit activities to support this scheme, including accepting concealed cash payments from members of a drug-trafficking organization and making the counterfeit products indistinguishable from legitimate products. *Id.* The drug-trafficking organization allegedly used Woodfield facilities and employees to effectuate the scheme. *Id.* This is enough to satisfy the pattern element at this stage of the case. The Second Amended Complaint adequately alleges that Defendants' actions demonstrate a continuing nature of criminal conduct throughout the scheme's seven-year lifespan.

   *5. Causation*

A plaintiff must also show an injury to its business or property that occurred "by reason of" a substantive RICO violation. *Jackson*, 372 F.3d at 1264. That is, these injuries must have been proximately caused by a violation of RICO. *Bivens Gardens Off. Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 906 (11th Cir.

1998). To prove proximate causation between a RICO violation and a subsequent injury, a plaintiff must present "some direct relation" between the alleged injurious conduct and the alleged injury. *Trujillo v. Williams*, 465 F.3d 1210, 1288 (10th Cir. 2006).

Plaintiff Virtus alleges the following injuries: (1) millions of dollars of lost profits; (2) reputational injuries with its customers; (3) exposure to penalties for breaches of contracts with third parties; and (4) exposure to penalties for breaches of financial covenants with lenders. Dkt. 38 at 27–29. Virtus alleges these injuries all stem from Defendants' RICO violations; had Defendants not engaged in money laundering and illegal drug trafficking, the DEA would not have seized Virtus products from Woodfield's warehouses, and Virtus would be able to sell the drugs to its customers and satisfy its financial and contractual obligations. These allegations are enough to satisfy the causation requirement at this juncture.

### 6.  *Concluding Remarks*

It remains to be seen whether the evidence supports Virtus's allegations that Defendants violated civil RICO. But Virtus alleges enough to survive dismissal under Rule 12(b)(6). Accepting as true the allegations in the Second Amended Complaint, the Court finds that Plaintiff Virtus adequately alleges every element of its civil RICO claim.

## II.      Civil RICO Conspiracy Claim

It is unlawful for any person to conspire to violate any of the RICO provisions. 18 U.S.C. § 1962(d). "A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts." *Republic of Pan. v. BCCI Holdings (Luxembourg) S.A*., 119 F.3d 935, 950 (11th Cir. 1997). The touchstone of liability is an agreement to participate in a RICO conspiracy. *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007); *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir. 1989) (explaining that, to assert a RICO conspiracy claim, facts must be alleged "that would indicate that [defendants] were willing participants in a conspiracy"). A RICO agreement need not be established by direct evidence; it may be inferred from the conduct of the participants. *Am. Dental Ass'n*, 605 F.3d at 1293 (citing *Republic of Panama v. BCCI Holdings (Luxembourg) S.A*., 119 F.3d 935, 950 (11th Cir. 1997)). "In addition to predicate crimes, a RICO conspiracy charge requires proof of an enterprise, of the continuity of racketeering activity, and of the defendant's knowledge of, agreement to, and participation in the conspiracy." *United States v. Gonzalez*, 921 F.2d 1530, 1546 (11th Cir. 1991).

As previously discussed, Plaintiff Virtus adequately alleges Defendants' underlying RICO violations to survive a motion to dismiss. Virtus's RICO

conspiracy claim therefore also survives dismissal. *See State Farm Mut. Auto. Ins. Co. v. Lewin*, 535 F.Supp.3d 1247, 1265 (M.D. Fla. 2021) (declining to dismiss RICO conspiracy claim when plaintiff adequately alleged substantive RICO claim). The factual allegations in the Second Amended Complaint create a reasonable inference that each Defendant was a willing participant in the RICO conspiracy.

## III.   Breach of Contract Claim

Plaintiff Virtus alleges Defendants breached several provisions of the Services Agreement.[6] Dkt. 38 at 37–38 (alleging Defendants breached the Services Agreement by failing to comply with applicable DEA regulations, failing to provide commercially reasonable services, failing to maintain accurate records, failing to provide notice of the DEA's inspections, and failing to indemnify Virtus for its losses). Virtus entered into the Services Agreement with Woodfield Distribution only; Woodfield Pharmaceutical and Mr. Runsdorf were not parties to the contract. *Id.* at 11. Nevertheless, Virtus argues Woodfield Pharmaceutical and Mr. Runsdorf may be liable for breach of contract under a veil piercing/alter ego theory. *Id.* at 45–46; Dkt. 44 at 19–21.

---

[6] Woodfield Distribution does not move to dismiss the breach of contract claim against it. Only Mr. Runsdorf and Woodfield Pharmaceutical move to dismiss this claim.

A contract generally binds only its signatories. *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1073 (11th Cir. 2003). When a corporation enters a contract, the owner of the corporation is not personally liable under the contract. Nor are corporations related to the signatory corporation. In exceptional circumstances, however, a court may pierce the veil of the signatory corporation to hold alter egos of the corporation responsible for its liabilities. *Eitzen Chem. (Singapore) PTE, Ltd. v. Carib Petroleum*, 749 F. App'x 765, 770 (11th Cir. 2018). Alter egos may include the owner of the corporation or related corporations. The burden rests on the party seeking to pierce the veil, and this burden is a significant one. *Id.*

Under Florida law,[7] a plaintiff must prove the following three factors to pierce the corporate veil:

(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence was in fact non-existent and the shareholders were in fact alter egos of the corporation;

(2) the corporate form must have been used fraudulently or for an improper purpose; and

(3) the fraudulent or improper use of the corporate form caused injury to the claimant.

---

[7] The Services Agreement calls for the application of Florida law to contractual disputes between the parties. Dkt. 38 at 43.

*Flooring Depot FTL, Inc. v. Wurtzebach*, 330 So. 3d 47, 49 (Fla. 4th DCA 2021). It is ultimately a factual determination whether a corporate entity should be disregarded. *Eitzen Chem.*, 749 F. App'x at 770. Accordingly, when analyzing a veil-piercing claim under a motion to dismiss, the issue is not whether the plaintiff may ultimately prevail on its veil-piercing theory. *Jackam v. Hosp. Corp. of Am. Mideast*, 800 F.2d 1577, 1579–80 (11th Cir. 1986). The issue instead is whether the plaintiff's allegations are sufficient to allow the plaintiff an attempt to prove its allegations through discovery. *Id.*

Here, the Second Amended Complaint adequately alleges that Mr. Runsdorf controlled the Woodfield Defendants to such an extent that he was an alter ego of the companies.[8] Dkt. 38 at 45 ("Runsdorf dominated and controlled his companies to such an extent that each LLC had no existence independent of Runsdorf—i.e., 'the LLC was the mere instrumentality or alter-ego' of Runsdorf[.]"). According to the Second Amended Complaint, Mr. Runsdorf "exercised complete control over

---

[8] The Court notes there is tension between Plaintiff's RICO claim and breach of contract claim. *See Sanchez v. Team Health, LLC*, No. 18-21174-civ-Martinez-Otazo-Reyes, 2021 WL 4990803, at *3 (S.D. Fla. Mar. 31, 2021) (addressing a similar tension). To impute liability to Mr. Runsdorf and Woodfield Pharmaceutical for the breach of contract claim, Plaintiff must successfully pierce the corporate veil. This requires Plaintiff to show Defendants acted as a unitary entity such that they were alter egos of Woodfield Distribution. But to establish the "enterprise" element of its RICO claim, Plaintiff must satisfy the "distinctness" requirement, *i.e.*, that Defendants were "free to act independently of each other and to advance their own separate interests." *See Boca Raton Cmty. Hosp., Inc. v. Tenet Healthcare Corp.*, 502 F. Supp. 2d 1237, 1253 (S.D. Fla. 2007), *aff'd sub nom.* 582 F.3d 1227 (11th Cir. 2009) ("[M]ere corporate separateness is not necessarily sufficient to establish a distinct RICO person and enterprise."). Plaintiff is allowed to plead in the alternative at this stage of the case. *See* Fed. R. Civ. P. 8(d).

Woodfield Distribution and Woodfield Pharmaceutical as the sole owner." *Id.* at 3. The DEA found similarly in its Order to Show Cause, stating that Mr. Runsdorf "exercises significant influence and control" over both Woodfield entities. *Id.* at 15. Indeed, because Mr. Runsdorf exerted such significant control over the Woodfield entities, the DEA found that "misconduct of either entity is relevant to the determination of whether the other can be entrusted with a DEA registration." *Id.* at 22. Plaintiff Virtus also alleges Mr. Runsdorf sold controlled substances that were being stored by Woodfield to a suspected drug-trafficking organization for $7,000. *Id.* at 22–23. This could demonstrate a commingling of personal and corporate resources, further supporting the alter ego theory.

Plaintiff Virtus also satisfies the second factor of the veil-piercing analysis at this early stage of litigation. To pierce the corporate veil, Virtus must ultimately prove that the corporate form *itself* was abused. *Eitzen Chem.*, 749 F. App'x at 772–73. In other words, although Mr. Runsdorf's alleged personal misconduct may have caused the Woodfield Defendants to breach the Services Agreement, the corporate veil may be pierced only if the fraud complained of is the result of the inequitable use of the corporate form itself. *See id.*; *see also N. Am. Clearing, Inc. v. Brokerage Comput. Sys., Inc.*, 666 F. Supp. 2d 1299, 1307–08 (M.D. Fla. 2009) (explaining that, even if an officer's misconduct causes "a corporation to intentionally breach a contract or commit conversion," piercing of the corporate

veil is not justified unless the misconduct involved improper use of the corporate form). The Second Amended Complaint alleges Mr. Runsdorf "used the LLC's corporate form fraudulently or for an improper purpose[.]" Dkt. 38 at 45. Examples of this misuse may include laundering money and abusing the companies' DEA registrations. *Id.* at 33. These allegations are enough at the dismissal stage. *See Eitzen Chem.*, 749 F. App'x at 773 n.11 (stating that trial court properly denied pre-trial motion to dismiss on this ground even when there was ultimately insufficient evidence the corporate form was misused). Virtus may conduct discovery to attempt to prove misuse of the corporate form.

Finally, Plaintiff Virtus sufficiently alleges it was injured by this wrongdoing. Virtus claims Defendants misused the Woodfield corporate forms to effectuate their drug-trafficking and money laundering schemes, which, in turn, led the DEA to seize Virtus products that were stored at Woodfield facilities. Dkt. 38 at 27. This seizure caused Virtus to lose tens of millions of dollars of sales and the trust of its customers. *Id.* These allegations are enough to survive dismissal. *See Eitzen Chem.*, 749 F. App'x at 773 n.11.

Time will tell whether there is sufficient evidence to pierce the corporate veil. This is a factual determination best left for summary judgment or trial. But at the dismissal stage—during which the Court must accept well-pleaded allegations as true—Plaintiff Virtus alleges enough. *See Associated Indus. Ins. Co. v.*

*Advanced Mgmt. Servs., Inc.*, No. 12-80393-CIV, 2013 WL 1149668, at *6 (S.D. Fla. Mar. 19, 2013) ("While discovery may not bear out sufficient evidence to support a claim on the merits for piercing the corporate veil at the dispositive motion stage or at trial, the factual allegations of Plaintiff's complaint, which the court accepts as true for purposes of the motion to dismiss, are sufficient to state a claim and to allow discovery on the application of piercing the corporate veil doctrine."). The Court declines to dismiss the breach of contract claims against Mr. Runsdorf and Woodfield Pharmaceutical.

## IV.    Claim For a Breach of the Covenant of Good Faith and Fair Dealing

Under Florida law, a covenant of good faith and fair dealing is implied in every contract. *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1315 (11th Cir. 1999); *see also Cnty. of Brevard v. Miorelli Eng'g, Inc*., 703 So. 2d 1049, 1050 (Fla. 1997). This covenant is designed to protect the contracting parties' reasonable expectations. *Speedway SuperAmerica, LLC v. Tropic Enters., Inc*., 966 So. 2d 1, 3 (Fla. 2d DCA 2007).

Mr. Runsdorf and the Woodfield Defendants argue this claim must be dismissed because Florida law does not recognize an independent claim for a breach of the implied covenant of good faith and fair dealing. *See, e.g.*, Dkt. 40 at 10–11. But this argument is misplaced on these unique facts alleged. *See generally Tim Minn, Inc. v. Tim Hortons USA Inc.*, No. 20-23481-CIV-Williams/Torres,

2021 WL 4482733, at \*12 (S.D. Fla. Aug. 2, 2021). To establish a breach of this covenant, a plaintiff must relate the breach to the performance of an express term of the contract. *Friedel v. Sun Cmtys., Inc.*, No. 20-12275, 2021 WL 3732992, at \*4 (11th Cir. Aug. 24, 2021). "A claimant asserting a cause of action for breach of the implied covenant must allege a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence; but, rather by a conscious and deliberate act, which unfairly frustrates the agreed common purpose and disappoints the reasonable expectations of the other party." *Id.* (quoting *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1329 (11th Cir. 2012)).

Virtus alleges Defendants violated several express provisions of the Services Agreement, including the obligation to provide Virtus services according to commercially reasonable standards, as well as the obligation to comply with applicable DEA regulations and other laws. Dkt. 38 at 43–44. According to Virtus, the Defendants did not breach these obligations through an honest mistake or bad judgment; they intentionally breached these obligations to profit from their illegal diversion of controlled substances into the black market. Virtus therefore sufficiently alleges a breach of the implied covenant of good faith and fair dealing on these facts alleged.

Woodfield Pharmaceutical and Mr. Runsdorf additionally argue this claim should be dismissed because they were not parties to the Services Agreement. Dkt.

39 at 17; Dkt. 41 at 14. However, pursuant to a veil piercing/alter ego theory, non-signatories to a contract may be liable for a breach of the implied covenant of good faith and fair dealing. *See, e.g.*, *Seward Prop., LLC v. Artic Wolf Marine, Inc.*, No. 3:18-cv-0078-HRH, 2021 WL 4860516, at *1 (D. Alaska Apr. 27, 2021) (finding non-signatory personally liable for breach of this covenant pursuant to a veil piercing/alter ego theory). This claim also survives dismissal.

## CONCLUSION

The Court **DENIES** Defendants' Motions to Dismiss, Dkts. 39, 40, and 41. The Defendants must file their answers in fourteen (14) days.

**DONE AND ORDERED** at Tampa, Florida, on July 19, 2022.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

**COPIES FURNISHED TO:**
Counsel of Record