# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

**VIRTUS PHARMACEUTICALS, LLC**,

    Plaintiff,

v.                                Case No. 8:21-cv-02427-WFJ-SPF

**WOODFIELD DISTRIBUTION, LLC**,
**WOODFIELD PHARMACEUTICAL, LLC**,
**ADAM RUNSDORF**, and **RELIABLE
HEALTHCARE LOGISTICS, LLC**,

    Defendants.

_____/

## ORDER

Before the Court are Plaintiff Virtus Pharmaceuticals, LLC ("Virtus") and Defendants Adam Runsdorf, Woodfield Distribution, LLC, and Woodfield Pharmaceutical, LLC's ("Woodfield Pharma") motions for summary judgment (Docs. 184, 185, 186 & 188). The parties have provided responses (Docs. 228 & 229) and replies (Docs. 243 & 244). After considering the record and taking oral argument, the Court grants Defendants' motions for summary judgment (Docs. 184, 185 & 186) as to Counts I and II alleging RICO violations. The Court grants summary judgment as to Mr. Runsdorf's and Woodfield Pharma's arguments that Virtus cannot pierce Woodfield Distribution's corporate veil, therefore terminating Mr. Runsdorf and Woodfield Pharma as parties to this case (Docs. 184 & 186). The

1

Court grants summary judgment as to Woodfield Distribution's argument that Virtus cannot recover punitive damages, and denies without prejudice summary judgment as to Distribution's argument that the contractual liability limiting provision applies.

The Court grants Plaintiff's motion for partial summary judgment (Doc. 188) as to Count III, only against Woodfield Distribution and only as to Sections 1.1 and 1.3 of the contract. The remainder of Virtus's motion is denied, and the remainder of the breach of contract and breach of implied covenant of good faith and dealing counts against Woodfield Distribution are reserved for trial as disputed or contested.

The Court rules at the outset that Count VI of the Third Amended Complaint, alleging a violation of the Florida Uniform Fraudulent Transfer Act against Woodfield Distribution and Reliable Healthcare Logistics, is severed and stayed pending the resolution of Reliable Healthcare Logistics' bankruptcy, Doc. 170.[1] *See* Fed. Rs. Civ. P. 42(b), 21; *Clay v. AIG Aerospace Ins. Servs., Inc.*, 61 F. Supp. 3d 1255, 1271 (M.D. Fla. 2014) ("It is ultimately within the court's discretion to sever a party or claim to proceed separately from the main action."); *Landis v. North American Co.*, 299 U.S. 248, 254 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.").

---

[1] The case has been stayed as to Reliable due to its bankruptcy filing.

2

The Court also notes at the outset that the parties should be prepared to address at pretrial how the Court's criminal causation ruling in this Order affects the applicability of the liability limiting clause in the parties' contract, if at all. The Court is not yet ruling on this issue without further elucidation from the parties. The last section of this Order specifies what the parties should discuss.

## BACKGROUND

Generally, this case concerns pharmaceutical products owned by Virtus and stored by Woodfield Distribution. Doc. 188-1 at 10–11. In 2021, the DEA seized all products in Woodfield Distribution's Texas facility pursuant to regulatory violations and suspected drug trafficking activity on the part of Woodfield Pharma and Mr. Runsdorf, parties related to Woodfield Distribution. *Id.* at 11–12; Doc. 185 at 2–3. Virtus's products were unrelated to the drug trafficking activity, yet were seized in the DEA raid and remain in DEA custody today. Doc. 188-1 at 12. Virtus filed this lawsuit seeking to recover from the Defendants under the Racketeer Influenced and Corrupt Organizations Act and breach of contract claims. *See generally* Doc. 112 at 53–95.

More specifically, Virtus is a virtual drug manufacturer that uses technical applications to develop pharmaceutical products, including controlled substances, but outsources the manufacture and distribution of those products to third parties. Doc. 188-1 at 10. Virtus itself is not registered with the DEA to handle the controlled

substances. *Id.* In this case, Virtus hired Woodfield Distribution to provide its warehousing and logistical services for Virtus's products. *Id.*

Woodfield Distribution was a company that provided warehousing and logistical services for a range of companies and items. Doc. 185 at 2. Woodfield Pharma was a pharmaceutical company that developed, manufactured, and packaged pharmaceutical products. *Id.* Mr. Runsdorf was the sole owner of both. *Id.*

Virtus and Woodfield Distribution's contract (their "Services Agreement") provided that Woodfield Distribution would store and distribute Virtus's products in compliance with all applicable federal and state laws, regulations, and rules. Doc. 188-1 at 11. Woodfield Distribution specifically agreed to comply with requirements of the U.S. Food and Drug Administration and the U.S. Drug Enforcement Agency. *Id.*

Notwithstanding that agreement, the DEA issued an order that suspended the DEA registrations held by Woodfield Distribution and Woodfield Pharma because of regulatory violations and suspected drug trafficking activity that endangered public safety. *Id.* at 11–12; Doc. 185 at 2–3. The DEA seized all products in Woodfield Distribution's Texas facility, citing the non-compliant storage conduct by Distribution and the drug trafficking activity by Woodfield Pharma and Mr. Runsdorf. Doc 188-1 at 12, 29. Woodfield Distribution ultimately surrendered its DEA registration. *Id.* at 29.

4

Woodfield Pharma and Mr. Runsdorf faced criminal charges for their conduct and pleaded guilty to conspiring to traffic counterfeit drugs, trafficking in counterfeit drugs, and conspiring to commit money laundering. Doc. 186 at 3.

Before sentencing in that criminal action in the Eastern District of Texas, Virtus sought monetary restitution from Mr. Runsdorf as a victim of his crimes under the Mandatory Victims Restitution Act. Doc. 184 at 23. The MVRA governs recovery for victims directly and proximately harmed by a defendant's offenses. 18 U.S.C. § 3663A(a)(2). The court found that Virtus was not a victim entitled to restitution because Mr. Runsdorf's underlying criminal conduct was not the direct and proximate cause of Virtus's losses, ultimately suffered because of the DEA raid. Doc. 184 at 23–24.

In this case, the parties, excluding Reliable Healthcare Logistics, have filed motions for summary judgment and partial summary judgment. *See generally* Docs. 184, 185, 186 & 188. The Court explains its rulings below.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996). An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the

5

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law. *Id.*

The moving party bears the initial burden of identifying those portions of the record demonstrating the lack of a genuinely disputed issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If met, the burden shifts to the non-moving party to "come forward with specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (citation omitted). To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party must go beyond the pleadings and "identify affirmative evidence" that creates a genuine factual dispute. *Crawford-El v. Britton*, 523 U.S. 574, 600 (1998).

In determining whether a genuine dispute of material fact exists, the Court must view the evidence and draw all factual inferences therefrom in a light most favorable to the non-moving party. *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007). In addition, the Court must resolve any reasonable doubts in the non-moving party's favor. *Id.* Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita*, 475 U.S. at 587.

## DISCUSSION

The Court's rulings on the RICO claims and contract claims follow.

## I.   RICO Claims

Virtus is collaterally estopped from arguing the causation element of RICO, and to any extent it is not, it cannot establish causation regardless.

Causation is only one element of RICO, which as a whole requires a private plaintiff suing under its civil provisions to show that a defendant "(1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of the plaintiff." *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1211 (11th Cir. 2020) (citation omitted). Defendants are entitled to summary judgment on Virtus's RICO claims, as explained below.

### A.   Virtus is collaterally estopped from arguing causation.

Defendants argue in their motions for summary judgment that Virtus is collaterally estopped from arguing the causation element of RICO because the Eastern District of Texas already decided it in Mr. Runsdorf's criminal case. *See* Docs. 184 at 22–25, 185 at 4–7 & 186 at 18–21. Virtus responds that Defendants have failed to establish the elements of collateral estoppel. Doc. 228 at 13–15.

Collateral estoppel "precludes the relitigation of an issue that has already been litigated and resolved in a prior proceeding." *Yellow Pages Photos, Inc. v. Tata*

*Consultancy Servs. Ltd.*, No. 8:17-cv-388-T-02CPT, 2020 WL 10486664, at *4 (M.D. Fla. Mar. 26, 2020). Four elements must be established for collateral estoppel to apply: "(1) the issue at stake must be identical to the one decided in the prior litigation; (2) the issue must have been actually litigated in the prior proceeding; (3) the prior determination of the issue must have been a critical and necessary part of the judgment in that earlier decision; and (4) the standard of proof in the prior action must have been at least as stringent as the standard of proof in the later case." *In re Southeast Banking Corp.*, 69 F.3d 1539, 1552 (11th Cir. 1995).

In the Eastern District of Texas, the court found that Virtus was not directly and proximately harmed by the criminal conduct underlying Mr. Runsdorf's offenses of conviction. *United States v. Runsdorf*, No. 1:21-CR-112(10), 2023 WL 4835113, at *3-4 (E.D. Tex. July 26, 2023). In that case, Virtus filed a motion for relief as a victim under the Mandatory Victims Restitution Act. *Id.* at *1. To recover as a victim under the MVRA, a person must be "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). In establishing the legal standard for direct and proximate harm, the court explained that a person is directly harmed when the criminal offense is a but-for cause of their harm. *Runsdorf*, 2023 WL 4835113, at *2. A person is proximately harmed when the harm suffered is a foreseeable consequence of the criminal conduct. *Id.* The court noted that "[i]mportantly, not every loss incurred by

8

a person or entity affected by a defendant's conduct qualifies under the MVRA." *Id.* (citation omitted).

In its analysis, the court explained that Virtus was not harmed by the conduct underlying Mr. Runsdorf's offenses of conviction—namely conspiracy to traffic drugs with a counterfeit mark, trafficking in drugs with a counterfeit mark, and conspiracy to commit money laundering. *Id.* at *3. The harm that victims generally suffer from counterfeiting offenses stems from the defendant's false markings interfering with the victims' legitimate products and intellectual property. *Id.* Virtus is not a victim that falls within this category as its products were not involved in the drug trafficking offenses. *Id.*

Most importantly, the *Runsdorf* court explained how the DEA's raid of Woodfield Distribution "[broke] the causal chain between Runsdorf's criminal offenses and the loss of Virtus's products." *Id.* Even more specifically, the court noted how the DEA could have raided Woodfield Distribution regardless of the criminal offenses because of the ongoing regulatory violations there. *Id.* at *4. These violations included, but were not limited to, "failure to: maintain effective controls against diversion, . . . maintain accurate continuing records, . . . report theft or significant loss of controlled substances, . . . operate an effective system to identify and report 'suspicious orders,' . . ." etc. *Id.* And, at any rate, "certainly[] the DEA's raid—which directly caused the confiscation of Virtus's products—cannot properly

be construed as 'underlying conduct' of Runsdorf's counterfeit drug trafficking offenses or his conspiracy to commit money laundering offense." *Id.* at *3 (citation omitted). As such, the independent raid and regulatory violations "defeat[ed] Virtus's argument that Runsdorf's criminal conduct was the direct and proximate cause of Virtus's loss." *Id.* at *4.

RICO requires establishing the same causation. The statute provides that "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court[.]" 18 U.S.C. § 1964(c). The injury flowing from a RICO violation "necessarily is the harm caused by the predicate acts." *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 13 (2010) (cleaned up). Predicate acts are comprised of the conduct constituting the violation. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016). To establish that a predicate act caused the alleged harm, a plaintiff must show "that the claimed racketeering activity . . . was the but-for and proximate cause of the plaintiff['s] injuries." *Id.* A claim for conspiring to engage in racketeering activity, as Virtus alleges in Count II, requires the same proof of causation. *See Beck v. Prupis*, 162 F.3d 1090, 1098 (11th Cir. 1998).

The question, here and in Texas, is therefore the same: Were the criminal acts the but-for and proximate cause of Virtus's harm? The answer, as already decided in Texas, is no. *Runsdorf*, 2023 WL 4835113, at *3–4. More specifically, as to the

first element of collateral estoppel, the causation issue at stake in this case is the same as the one decided in Mr. Runsdorf's criminal case. *See In re Southeast Banking Corp.*, 69 F.3d at 1552.

Virtus argues in response that whether Virtus was a victim under the MVRA and whether Virtus can satisfy proximate causation in a civil RICO claim are not identical questions. Doc. 228 at 13–14. Indeed, the Texas court criticized Virtus for failing "to adduce any authority where courts relied on proximate cause frameworks from civil cases in order to evaluate whether a third party was considered a victim" under the MVRA. *Runsdorf*, 2023 WL 4835113, at *5. But raising a question in two different contexts does not automatically make it two different questions. A victim under the MVRA is one who is "directly and proximately harmed as a result of the commission of an offense[.]" 18 U.S.C. § 3663A(a)(2). A plaintiff under civil RICO is one who suffered harm that was actually and proximately caused by racketeering conduct. *E.g.*, *Ray*, 836 F.3d at 1349; *Hemi Group*, 559 U.S. at 9. These definitions elicit the same analysis, which can be answered with the Texas court's conclusion in Mr. Runsdorf's case: "In sum, Virtus cannot demonstrate that Runsdorf's criminal offenses both directly and proximately caused the loss of its products because the DEA's raid on Woodfield Distribution broke the causal chain between Runsdorf's offenses and Virtus's loss." *Runsdorf*, 2023 WL 4835113, at *4. The issue has been decided.

As to the second element of collateral estoppel, the causation issue was actually litigated in Texas. *See In re Southeast Banking Corp.*, 69 F.3d at 1552; *In re Goldbronn*, 263 B.R. 347, 363 (Bankr. M.D. Fla. 2001) ("[A]n issue is actually litigated when it is properly raised by the pleadings or otherwise, is submitted for determination and is determined." (citation omitted)). Virtus submitted an extensive Motion for Relief as a Victim of Crime to the Texas district court, and filed a reply to the Government's response in opposition. *Runsdorf*, 2023 WL 4835113, at *1. Pursuant to its consideration of the filings and ultimate ruling that Virtus was not a victim under the MVRA, the court then found that Virtus was not entitled to an opportunity to be heard at Mr. Runsdorf's sentencing. *Id.* at *5–6. In other words, only after the issue was litigated did the court deny Virtus additional opportunity to argue.

Virtus again asserts that the RICO issue of whether it suffered losses by reason of the Defendants' racketeering activities was not "actually litigated" in the Texas criminal court, Doc. 228 at 14, but, as discussed *supra*, it was. The second element of collateral estoppel is therefore satisfied. *See In re Southeast Banking Corp.*, 69 F.3d at 1552.

The third element of collateral estoppel, that the prior determination of the issue was a critical and necessary part of the judgment in the earlier decision, is met. *Id.* Indeed, the determination that the criminal acts did not directly and proximately

12

cause Virtus's harm was central to rejecting Virtus's status as a victim under the MVRA. *Runsdorf*, 2023 WL 4835113, at *6. Virtus again argues that "civil RICO causation was not a critical and necessary part of the Texas district court's ruling" because civil RICO cases are inapposite to MVRA cases. Doc. 228 at 15. But as explained, the analysis in deciding whether one is a victim in an MVRA claim and whether one has been harmed by racketeering activity in a civil RICO claim is the same. As such, the prior determination of causation was necessary to the Texas court's decision, so the third element of collateral estoppel is met.

There is no dispute that the standard of proof in the prior action was at least as stringent as the standard of proof here, so all four elements of collateral estoppel are satisfied. *See In re Southeast Banking Corp.*, 69 F.3d at 1552. Virtus is therefore collaterally estopped from arguing causation in its civil RICO claims. Consequently, the Court grants summary judgment for Woodfield Distribution, Woodfield Pharma, and Mr. Runsdorf on Counts I and II of Virtus's Third Amended Complaint.

### B. To any extent Virtus is not collaterally estopped from arguing causation, it cannot establish causation regardless.

As the Texas district court has already explained, Virtus cannot show that the racketeering activity in this case actually and proximately caused its losses. *Ray*, 836 F.3d at 1349.

As an initial matter, the parties in this case make much of the question of whether the drug trafficking activity was the cause of the DEA's suspension order

and subsequent raid, although that is not really where the issue lies. Virtus argues that the DEA had requested an immediate suspension order for Woodfield Distribution for regulatory violations in August 2020, yet it was only after evidence of the drug trafficking activity was collected and added to the order, one year later, that it was actually issued. Doc 188-1 at 25–26. Defendants assert that the regulatory violations of Woodfield Distribution, not the drug trafficking activity of Mr. Runsdorf and Woodfield Pharma, were the only bases offered by the DEA to support its seizure of the products at Distribution's Texas facility. Doc. 185 at 8–9. Supposing *arguendo* that the DEA's order suspending Woodfield Distribution's registration was based entirely on the drug trafficking activity, Virtus would still not be able to satisfy the causation element of RICO. Proximate cause cannot be established.

As discussed *supra*, establishing causation in a civil RICO claim requires showing "that the claimed racketeering activity . . . was the but-for and proximate cause of the plaintiff['s] injuries." *Ray*, 836 F.3d at 1349. The concept of proximate cause is used "to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). It demands some direct relation between the harm suffered and the injurious conduct. *Id.* Indeed, allowing "secondary victims" to recover under RICO would "run afoul of proximate-causation standards." *Id.* at 274.

14

*Hemi, supra*, illuminates the standard of causation that applies to civil RICO claims. In *Hemi*, Hemi Group sold cigarettes online to residents of New York City. 559 U.S. at 4. New York City taxed the possession of cigarettes, yet neither state nor city law required Hemi Group to charge the tax. *Id.* Federal law, however, did require Hemi Group to submit customer information to the state of New York because it was an out-of-state vendor. *Id.* Alleging that Hemi Group failed to submit this information, New York City (not New York State) filed a RICO claim to recover millions of dollars in uncollected cigarette taxes. *Id.*

The Supreme Court found that New York City could not show that it lost tax revenue by reason of the alleged RICO violation. *Id.* at 5. Highlighting the attenuation of the City's causal theory, the Supreme Court explained that "[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Id.* at 10 (quoting *Holmes*, 503 U.S. at 271–72). The City's injury resulted from Hemi Group not submitting customer information to New York State, that then could not pass the information to the City, that then could not use the information to determine which customers to pursue for their unpaid taxes. *Id.* at 9. Hemi Group's violation was therefore failing to report information to New York State, but the actual harm suffered by the City was cigarette smokers neglecting to pay taxes (albeit more easily since Hemi Group did not share their information). *Id.* at 11. The Supreme Court declined to stretch the causal chain of a RICO violation to include

15

such intervening parties, explaining that "[b]ecause the City's theory of causation requires us to move well beyond the first step, that theory cannot meet RICO's direct relationship requirement." *Id.* at 10.

*Hemi* also discusses *Holmes*, *supra*, and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). In *Anza*, Ideal Steel Company brought a RICO claim against its competitor for failing to charge and remit sales taxes, thereby undercutting Ideal's prices and stealing its customers. 547 U.S. at 454–55. The Supreme Court reasoned that the connection between the fraud alleged and the harm suffered was too attenuated for Ideal to recover under RICO. *Id.* at 459. The alleged RICO violation was defrauding the state, while Ideal was harmed by its competitor's allegedly related but separate decision to offer lower prices. *Id.* at 458. The alleged violation therefore had not led directly to the plaintiff's injuries, so proximate cause was not established. *Id.* at 461.

In *Holmes*, the Securities Investor Protection Corporation filed a RICO claim against defendants who had allegedly manipulated stock prices. 503 U.S. at 262–63. The discovery of the conspiracy to manipulate the stock prices caused them to plummet, rendering broker-dealers unable to meet their obligations to customers. *Id.* SIPC, as the insurer, was responsible for $13 million to cover the customers' claims. *Id.* at 263. The Supreme Court held that the alleged conspiracy harmed the broker-

dealers, but SIPC's injury was purely contingent on that harm, so RICO's direct relationship requirement was not satisfied. *Id.* at 271.

The case before the Court aligns with the lack of causation in *Hemi*, *Anza*, and *Holmes*. In *Holmes*, the Supreme Court declined to find RICO causation for a victim (SIPC) of a victim (broker-dealer) of racketeering activity because the connection was too attenuated. 503 U.S. at 271. Here, Virtus is not even a victim of a victim of the offenses regarding trafficking in drugs with counterfeit marks. *Id.*; *see Runsdorf*, 2023 WL 4835113, at *3. Virtus does not contend that it was a victim whose products were involved with the drug trafficking or affected by the counterfeiting. *Runsdorf*, 2023 WL 4835113, at *3. Nor does it contend that it was secondarily impacted by a victim's losses, as was the case in *Holmes*. Rather, Virtus's harm stems from an entirely distinct event, namely the DEA's superseding choice to raid, seize, and perpetually hold all the products in Woodfield Distribution's Texas facility. Doc. 188-1 at 11–12. Virtus was therefore not a victim, in any degree, of the conduct constituting the RICO violation. *See Holmes*, 503 U.S. at 271; *Ray*, 836 F.3d at 1349. As such, there exists no direct connection between the predicate acts and the injury suffered. *See Holmes*, 503 U.S. at 268.

The RICO claim in *Anza* failed for lack of causation, too, and was also less stark than the lack of connection between the racketeering conduct and harm in this case. In *Anza*, the Supreme Court declined to find RICO causation where the same

defendant failed to pay taxes and also offered lower sales prices than its competitor, reasoning that the alleged tax violation did not lead directly to the plaintiff's lost customers. 547 U.S. at 458, 461. Although the same entity committed the fraudulent act and engaged in the harmful conduct, the Supreme Court found that the acts were sufficiently distinct to defeat RICO causation. *Id.* In this case, it is not even just one Defendant's conduct or scheme that arguably led directly to the Plaintiff's injuries; it is not *any* Defendant's conduct that led directly to the Plaintiff's injuries. Virtus's losses resulted from the DEA's intervening decision to seize and then keep all the inventory at Woodfield Distribution in Texas, even the innocent inventory belonging to Virtus. Doc. 188-1 at 11–12. Therefore, here, neither the Defendants' racketeering conduct, nor any of their conduct arguably related to it, led directly to Virtus's losses. *See Anza*, 547 U.S. at 458, 461.

Finally, this case parallels the logic in *Hemi* finding a lack of RICO causation. Recall that in *Hemi*, the Supreme Court declined to extend RICO liability to the situation where Hemi Group failed to report customer information to the state, that then could not share the information with New York City, that then could not pursue the appropriate residents who decided not to pay their taxes. 559 U.S. at 9. In the abstract, the defendant engaged in alleged racketeering activity, which resulted in inaction or action on the part of an intermediary, which ultimately allowed or caused harm to happen upon the plaintiff. Similarly here, Mr. Runsdorf and the Woodfield

18

entities engaged in or were connected to drug trafficking activity, which resulted in a raid and product seizure by the DEA, which ultimately caused Virtus's losses. Doc. 188-1 at 11–12; Doc. 185 at 2–3. These intervening, intermediary causes of harm, here and in *Hemi*, sever the direct relationship between racketeering activities and a plaintiff's harm. 559 U.S. at 11. Awarding damages, therefore, to a secondary plaintiff that was not directly harmed by the injurious conduct is contrary to "[t]he general tendency of the law . . . not to go beyond the first step." *Id.* at 10 (citation omitted). The Court declines to move beyond the first step, and as such grants Defendants' motions for summary judgment on Virtus's civil RICO claims, Counts I and II.

Virtus argues in rebuttal that civil RICO imposes no requirement for Virtus to prove that it was the victim of the criminal misconduct, *e.g.*, that its products were counterfeited, or its money was laundered. Doc. 243 at 6. Virtus explains that direct harm is the standard, and cites *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008) as an illustration. In *Bridge*, bidders at a county auction brought a civil RICO claim alleging that they lost auction items because of a fraudulent scheme of other bidders. 553 U.S. at 643–44. While the plaintiffs did not personally rely on the defendants' misrepresentations, the Supreme Court found that was not necessary to establish causation because their injury was still the direct result of the defendants' scheme to obtain more auction items for themselves. *Id.* at 657–58. The court noted

19

that the alleged injury was the natural consequence of the defendants' scheme, and "unlike in *Holmes* and *Anza*, there are no independent factors that account for [the plaintiffs'] injury[.]" *Id.* at 658.

Here, conversely, Virtus was not harmed as a direct result of the Defendants' scheme. *Id.* at 657–58. Indeed, independent factors entirely account for Virtus's injury, namely the DEA's decision to seize and continue to hold all the inventory that was inside Woodfield Distribution's Texas facility, which unfortunately happened to include Virtus's products. *Id.* at 658; Doc. 188-1 at 11–12; Doc. 185 at 2–3. Virtus cannot escape the fact that the DEA raid was not racketeering conduct that injured it, regardless of whether that injury is characteristic of a crime victim or not.

Accordingly, Virtus cannot establish causation, and summary judgment is warranted for the Defendants on the RICO counts.

## II.   Contract Claims

Virtus asserts claims for breach of contract and breach of the implied duty of good faith and fair dealing against Woodfield Distribution. Doc. 112 at 70–75. It also asserts these claims against Mr. Runsdorf and Woodfield Pharma under the theories of piercing the veil and alter ego. *Id.*

As explained below, Woodfield Pharma and Mr. Runsdorf cannot be liable for the breach of contract claims under a veil-piercing theory. However, Woodfield

20

Distribution breached Sections 1.1 and 1.3 of the Services Agreement, and a breach of Section 5.1 remains to be decided by a jury. Lastly, Virtus is not entitled to punitive damages.

Importantly, the Court asks the parties to be prepared for further argument on the application of the liability limiting clause in the Services Agreement. The last section in this Order will explain what the parties should be prepared to discuss.

### A. Woodfield Pharmaceutical cannot be liable under a pierce-the-corporate-veil theory because it is not a shareholder of Woodfield Distribution.

As an initial matter, Woodfield Pharma argues that it cannot be liable for the breach of contract claims as a matter of law because it is not a shareholder of Woodfield Distribution—the entity whose corporate veil Virtus seeks to pierce. Doc. 186 at 4.

Indeed, the Eleventh Circuit has held that Florida law only allows personal liability to be imposed on a defendant under a veil-piercing theory if the defendant is a shareholder of the corporation. *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1351 (11th Cir. 2011); *see also Market Int'l Ins. Co. v. Int'l Brokerage & Surplus Lines, Inc.*, No. 8:09-cv-400-T-27TBM, 2011 WL 13176234, at *2 (M.D. Fla. Mar. 25, 2011); *Centimark Corp. v. A to Z Coatings & Sons, Inc.*, No. 6:05-cv-136-Orl-DAB, 2007 WL 4557247, at *5 (M.D. Fla. Dec. 21, 2007) ("Plaintiff does not seek to 'pierce the corporate veil' and hold shareholders . . . liable; it seeks to

hold another corporation liable [that] is not a shareholder . . . . The theory is inapplicable here.").

The parties do not dispute that Mr. Runsdorf is the sole member, manager, and owner of both Woodfield Distribution and Woodfield Pharma. Doc. 184 at 7; Doc. 185 at 2; Doc. 186 at 3; Doc. 188-1 at 13. Woodfield Pharma, consequently, is not a shareholder of Woodfield Distribution. As such, it cannot be held liable for the breach of contract claims under a veil-piercing theory as a matter of law. *Lama*, 633 F.3d at 1351; *Market Int'l*, 2011 WL 13176234, at *2; *Centimark*, 2007 WL 4557247, at *5.

Moreover, Woodfield Pharma may at this point be terminated as a party. The Court has granted summary judgment for Woodfield Pharma on the RICO claims, Counts I and II, as previously discussed. Counts III and IV are the contract claims for which Woodfield Pharma cannot be liable. Counts V and VI are not alleged as to Woodfield Pharmaceutical, LLC, which is therefore no longer a party to this case.

### B. Woodfield Distribution's corporate veil cannot be pierced as to Adam Runsdorf.

Mr. Runsdorf argues that Virtus cannot pierce Woodfield Distribution's corporate veil because (1) Mr. Runsdorf did not dominate and control Distribution such that it had no independent existence, (2) Virtus cannot prove that Distribution was used for a fraudulent purpose, and (3) Virtus cannot prove that Distribution's alleged fraudulent purpose caused it injury. Doc. 184 at 9–16. Virtus argues that Mr.

Runsdorf is not entitled to summary judgment on the pierce-the-veil issue because at trial, Virtus could prove that (1) Mr. Runsdorf was an alter ego of Woodfield Distribution, (2) the corporate form was misused, and (3) Virtus was injured by Mr. Runsdorf's misuse of the corporate form. Doc. 228 at 19–23.

In Florida, "courts are extremely reluctant to pierce the corporate veil and will do so only in exceptional cases where there has been extreme abuse of the corporate form and a showing of improper conduct." *Molinos Valle Del Cibao, C. por A. v. Lama*, No. 07-23066-CIV-UNGARO, 2009 WL 10668577, at *4 (S.D. Fla. Feb. 10, 2009) (citation omitted). "Improper conduct" refers to the corporation being organized or used to mislead or perpetrate a fraud on creditors. *Wurtzebach v. Flooring Depot FTL, Inc.*, 384 So. 3d 251, 255 (Fla. 4th DCA 2024) (quoting *Dania Jai-Alai Palace, Inc. v. Sykes*, 450 So. 2d 1114, 1119–20 (Fla. 1984)).

To pierce the corporate veil, a claimant must show that "(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact non-existent and the shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudulently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant." *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. 3d DCA 2008) (citation omitted).

Specifically, "even if a corporation is merely an alter ego of its dominant shareholder or shareholders, the corporate veil cannot be pierced so long as the corporation's separate identity was lawfully maintained." *Lipsig v. Ramlawi*, 760 So. 2d 170, 187 (Fla. 3d DCA 2000) (citing *Mayer v. Eastwood, Smith & Co.*, 164 So. 684, 687 (Fla. 1935) (explaining that "[s]o long as proper use is made of [the] fiction that [the] corporation is [an] entity apart from [the] stockholders, [the] fiction will not be ignored.") (citation omitted)). Moreover, the commingling of business and personal monies, without more, is insufficient evidence to satisfy the first element required to pierce the corporate veil. *Flooring Depot FTL, Inc. v. Wurtzebach*, 330 So. 3d 47, 49–50 (Fla. 4th DCA 2021). Consolidated management of multiple entities, too, does not alone justify piercing the corporate veil under Florida law. *See Lama*, 2009 WL 10668577, at *4. Nor does "poor handling of a closely-held corporation's business affairs[.]" *Id.*

Although improper conduct in a potential veil-piercing situation is a question for the jury, *Seminole Boatyard, Inc. v. Christoph*, 715 So. 2d 987, 990 (Fla. 4th DCA 1998), Mr. Runsdorf is entitled to summary judgment on this issue. The evidence Virtus has produced cannot pierce Woodfield Distribution's corporate veil. Woodfield Distribution was lawfully maintained; it was registered as a limited liability company in Florida, complied with those filing and reporting requirements, owned assets like facilities and bank accounts, and maintained its own employees,

operations, books, and records. Doc. 184 at 12. It operated warehouses in five states and handled logistics for diverse items, including Amazon products and, not least importantly, Virtus products. *Id.* at 15. This maintenance of the corporate form prevents piercing its veil. *Lipsig*, 760 So. 2d at 187; *Mayer*, 164 So. at 687.

Furthermore, Virtus's argument offered to show that Mr. Runsdorf was an alter ego of Woodfield Distribution, Doc. 228 at 21–22, is that he commingled money between himself and his businesses. While he may well have done so, and also used his personal credit card to pay invoices on behalf of Woodfield Pharma and Woodfield Distribution (Doc. 228 at 22), commingling of business and personal funds alone is insufficient to show that a corporation did not exist independently of a shareholder. *Wurtzebach*, 330 So. 3d at 49–50; *see Gasparini*, 972 So. 2d at 1055.

Additionally, Mr. Runsdorf is indeed the common owner of both Woodfield Distribution and Woodfield Pharma (Doc. 184 at 7), but this consolidated management is also not grounds for piercing the corporate veil. *See Lama*, 2009 WL 10668577, at *4. Finally, notwithstanding Woodfield Distribution's regulatory violations and faulty maintenance of records and controlled substances (Doc. 184 at 10), it was still a corporation whose "poor handling . . . of business affairs" does not entitle Virtus to pierce its veil. *Lama*, 2009 WL 10668577, at *4.

Consequently, Virtus cannot establish the first element required to pierce the corporate veil—that Mr. Runsdorf dominated and controlled Woodfield Distribution

to such an extent that Woodfield Distribution's independent existence was in fact non-existent. *See Gasparini*, 972 So. 2d at 1055. As such, Mr. Runsdorf is entitled to summary judgment on the issue of whether Woodfield Distribution's corporate veil may be pierced. Further, Adam Runsdorf may at this point be terminated as a party. The Court has granted summary judgment for him on the RICO claims, Counts I and II, as previously discussed. Counts III and IV are the contract claims for which he cannot be liable under a veil-piercing theory. Counts V and VI are not alleged as to Mr. Runsdorf, who is therefore no longer a party to this case.

**C.   Woodfield Distribution admits it breached Section 1.3 of the Services Agreement.**

As a matter of uncontested fact and law, Woodfield Distribution admits that it entered into a valid and binding Services Agreement with Virtus, and breached Section 1.3 of said agreement. Doc. 229 at 20.

The elements for breach of contract under Florida law are "(1) the existence of a contract, (2) a breach of the contract, and (3) damages resulting from the breach." *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006). The Services Agreement between Virtus and Woodfield Distribution is a contract under Florida law. *See Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1295 (M.D. Fla. 2018).

Woodfield Distribution states as follows in Defendants' Joint Response in Opposition to Plaintiff's Motion for Partial Summary Judgment:

Distribution does not dispute that it breached Section 1.3 of the Agreement at its Texas facility. Specifically, Distribution does not dispute that it did not notify Virtus of DEA audits and inspections, and that the DEA's allegations of *regulatory* violations (not the criminal conduct that serves as the basis for Virtus' predicate act argument) directly and proximately led to the DEA seizing Virtus' products. Thus, Distribution consents to the Court entering partial summary judgment against it (and only it) on Virtus' breach of contract claim based on Section 1.3 of the 3PL Agreement.

Doc. 229 at 19.

As such, the Court enters summary judgment for Virtus on its claim that Woodfield Distribution breached Section 1.3 of the Services Agreement.

### D.    Woodfield Distribution breached Section 1.1[2] of the Services Agreement.

Virtus argues that under Section 1.1 of the Services Agreement, Woodfield Distribution agreed to warehouse and distribute Virtus's products according to commercially reasonable standards. Doc. 188-1 at 28. It failed to do so because the

---

[2] Section 1.1 of the Services Agreement, Doc. 189-4 at 2, provides as follows:

**Description of 3PL Services Offered.** WD offers to provide the following services to VP according to commercially-reasonable standards (the "3PL Services") solely as requested by VP:

a)  Inventory management, including, without limitation, warehouse, storage, fulfillment, order-processing and quarantine functions;
b)  Distribution, handling and shipment of pharmaceutical products;
c)  Assistance with various federal and state pedigree and product-tracking compliance;
d)  Assistance with third-party agents of VP in information technology, transportation, reverse-distribution and recall-related services;
e)  Provision of daily, weekly, monthly and as otherwise requested, concerning service levels provided by WD; and
f)  Any other services reasonably requested by VP.

DEA, pursuant to the misconduct cited in the suspension order, raided Distribution's Texas warehouse and seized Virtus's products, which remain in DEA custody to date. *Id.* Woodfield Distribution argues that it did not breach Section 1.1 of the Services Agreement because it continued to store and distribute Virtus's remaining products at its Boca Raton facility after the DEA raid in Texas, which did not impact Boca Raton. Doc. 229 at 21.

Notwithstanding the fact that Woodfield Distribution may not have breached Section 1.1 of the Services Agreement in Boca Raton, it cannot be argued that Distribution "provide[d] [warehousing and distribution] services to [Virtus] according to commercially-reasonable standards" at its Texas facility and following the DEA seizure. Doc 189-4 at 2. While the parties disagree as to whether or to what extent regulatory violations versus drug trafficking spurred the DEA's raid, it is undisputed that some level of commercially unreasonable negligence or misconduct sparked the series of events that transpired in Texas. Doc. 188-1 at 12; Doc. 185 at 2. It is therefore uncontested as a matter of fact and law that Woodfield Distribution contracted with Virtus to provide storage and distribution services according to commercially reasonable standards in Texas, and it failed to effectively provide those services in a breach of that contract in Texas.[3] *See Butland*, 951 So. 2d at 876.

---

[3] *Compare* the breach of Section 1.1 only at the Texas facility *with* Woodfield Distribution's admission "that it breached Section 1.3 of the Agreement *at its Texas facility*." Doc. 229 at 19 (emphasis added).

As to damages, a plaintiff in a breach of contract case must show that the defendant's breach was a substantial factor in causing its damage. *Stensby v. Effjohn Oy Ab*, 806 So. 2d 542, 544 (Fla. 3d DCA 2001). An "injured party is entitled to recover all damages that are causally related to the breach so long as the damages were reasonably foreseeable at the time the parties entered into the contract." *Capitol Env't Servs., Inc. v. Earth Tech, Inc.*, 25 So. 3d 593, 596 (Fla. 1st DCA 2009) (citation omitted). "Damages are foreseeable if they are the 'proximate and usual consequence' of the breaching party's act." *Id.* (quoting *Fla. E. Coast Ry. Co. v. Beaver St. Fisheries, Inc.*, 537 So. 2d 1065, 1068 (Fla. 1st DCA 1989)). The parties need not have contemplated the exact injury that resulted so long as the actual consequences "could have reasonably been expected to flow from the breach." *Id.* (quoting *Mnemonics, Inc. v. Max Davis Assocs., Inc.*, 808 So. 2d 1278, 1281 (Fla. 5th DCA 2002)).

Whether Woodfield Distribution's failure to effectively provide its services caused Virtus to suffer damages, and, more importantly, the amount of damages Virtus suffered, are questions for the jury in the case. *See Capitol Env't Servs.*, 25 So. 3d at 595–96.

Therefore, Virtus is entitled to summary judgment on its claim that Woodfield Distribution breached Section 1.1 of the Services Agreement. As above with Section 1.3, the amount of damages is to be determined at trial.

**E.     Whether Woodfield Distribution breached Section 5.1 of the Services Agreement is a jury question.**

Section 5.1 of the Services Agreement states that Woodfield Distribution would "not knowingly engage in any actions or omissions concerning its compliance with applicable regulations, which, in turn, would materially restrict or impede the other party's ability to comply with its own regulatory requirements or to pursue to [sic] its commercial and business purposes." Doc. 189-4 at 4. Virtus argues that Woodfield Distribution breached this provision for the reasons provided by the DEA in its suspension order, and for admitting liability to the extent admitted in Mr. Runsdorf's guilty plea. Doc. 188-1 at 30.

Woodfield Distribution responds that acting "knowingly" requires that Distribution "intentionally and deliberately engaged in conduct related to its regulatory compliance that would impede Virtus' ability to pursue its commercial and business purposes." Doc. 229 at 22. Woodfield Distribution asserts that Virtus has not proved this, as the DEA did not allege that Distribution intentionally engaged in any of its misconduct, and Mr. Runsdorf's guilty plea is inapplicable to Distribution as it was never a party to the criminal action. *Id.* at 22–23.

This question of what Woodfield Distribution knew is one squarely within the province of the jury. *See, e.g.*, *Brunson v. First Nat'l Bank of Bryan*, 405 F.2d 1193, 1194 (5th Cir. 1969) (whether a creditor knew or should have known of a debtor's insolvency was a question of fact for the jury); *Ricketson v. Seaboard Airline R. Co.*,

403 F.2d 836, 840 (5th Cir. 1968) (whether a plaintiff knew about the dangerousness of a condition was a question of fact for the jury); *Cardenas ex rel. Cardenas v. Godbold*, 625 So. 2d 98, 99–100 (Fla. 5th DCA 1993) (when a patient knew or was on notice of invasion of their legal rights regarding possible medical malpractice was a question of fact for the jury).

Here, therefore, whether Woodfield Distribution "knowingly" engaged in any actions or omissions concerning its compliance with applicable regulations is a question of fact for the jury. Doc. 189-4 at 4; *e.g.*, *Brunson*, 405 F.2d at 1194. As such, Virtus's motion for summary judgment is denied on this issue, and it will proceed to trial as contested.

### F.    Virtus cannot recover punitive damages.

The parties disagree as to whether Virtus can recover punitive damages. Woodfield Distribution argues that punitive damages are not available for a breach of contract claim unless it is accompanied by an independent tort claim, and Virtus has not alleged an independent tort claim. Doc. 185 at 17–19. Virtus argues that it has alleged an independent cause of action that allows for the recovery of punitive damages, namely that Defendants fraudulently attempted to avoid liability by executing an asset purchase agreement between Woodfield Distribution and Reliable Healthcare Logistics. Doc. 228 at 28. This appears to arise in connection with Counts V and VI, which relate to fraudulent transfers alleged with Reliable Healthcare

Logistics. Doc. 112 at 75–93. These counts have been stayed and will not proceed to trial.

"In Florida, punitive damages are generally not available for breach of contract claims unless the breach of contract claim is accompanied by a separate and independent tort claim." *Tibbetts Lumber Co. v. Amerisure Ins. Co.*, No. 8:19-cv-1275-KKM-AAS, 2021 WL 4502305, at *2 (M.D. Fla. June 11, 2021) (citation omitted); *Ferguson Transp., Inc. v. N. Am. Van Lines, Inc.*, 687 So. 2d 821, 822 (Fla. 1996) ("Only if a party to a contract proves a tort independent from the acts that breach the contract is the party entitled to recover punitive damages.").

As the breach of contract claims against Woodfield Distribution are the only remaining claims in this action, punitive damages are not available for them. *E.g.*, *Tibbetts*, 2021 WL 4502305, at *2. The Court therefore enters summary judgment for Defendants on this issue.

> **G.    The parties should be prepared to address at pretrial the applicability of the Limitation of Liabilities provision in the parties' Services Agreement given the Court's finding that criminal misconduct did not proximately cause Virtus's losses.**

Woodfield Distribution argues that the limitation of liability provision in its Services Agreement with Virtus is enforceable such that Virtus cannot recover consequential damages, such as lost profits. Doc. 185 at 13. Distribution asserts that Florida courts regularly uphold such provisions so long as they are mutual and reasonable. *Id.* at 13–14.

32

Virtus responds that the clause is not enforceable because of the misconduct in this case, which "falls outside the scope of the parties' bargained-for exculpatory clause." Doc. 228 at 25. Virtus states that under Florida law, exculpatory clauses are enforceable only to the extent that the intention to be relieved was clear in the contract, and the criminal misconduct was unexpected in this case. *Id.* Virtus further argues that criminal conduct aside, Distribution's regulatory violations that it failed to disclose to Virtus are intentional misconduct beyond the scope of exculpatory clauses. *Id.* at 26.

The Court is not yet willing to rule on this issue without additional argument from the parties. The parties should be prepared to discuss how the Court's ruling that the criminal conduct in this case did not proximately cause Virtus's losses relates to the liability limiting clause. Does this ruling moot any argument that intentional misconduct can invalidate a provision limiting liability for certain damages that arise out of a contract? The parties should be prepared to discuss what conduct affects the limitation of liability provision and how.

## CONCLUSION

Accordingly, it is hereby **ORDERED** and **ADJUDGED**:

(1) Defendant Adam Runsdorf's Motion for Summary Judgment (Doc. 184) is **GRANTED** as to Counts I and II, and as to Mr. Runsdorf's argument that Virtus cannot pierce Woodfield Distribution's corporate veil.

(2) The Clerk is directed to enter final judgment in favor of Defendant Adam Runsdorf.

(3) The Clerk is directed to terminate Adam Runsdorf as a party in this case.

(4) Defendant Woodfield Distribution, LLC's Motion for Partial Summary Judgment (Doc. 185) is **GRANTED** as to Counts I and II, and as to Distribution's argument that Virtus cannot recover punitive damages. Woodfield Distribution's Motion is **DENIED without prejudice** as to Distribution's argument that the contractual liability limiting provision applies.

(5) Defendant Woodfield Pharmaceutical, LLC's Motion for Summary Judgment (Doc. 186) is **GRANTED** as to Counts I and II, and as to Pharma's argument that Virtus cannot pierce Woodfield Distribution's corporate veil as to Woodfield Pharmaceutical.

(6) The Clerk is directed to enter final judgment in favor of Defendant Woodfield Pharmaceutical, LLC.

(7) The Clerk is directed to terminate Woodfield Pharmaceutical, LLC as a party in this case.

(8) Plaintiff Virtus Pharmaceuticals, LLC's Motion for Partial Summary Judgment (Doc. 188) is **GRANTED IN PART** as to Count III, only as to

Woodfield Distribution, LLC and only as to Sections 1.1 and 1.3 of the contract. The remainder of Virtus's Motion is **DENIED**.

(9) This case will proceed to final pretrial conference and trial on the remainder of the Counts as previously scheduled.

**DONE AND ORDERED** at Tampa, Florida, on September 19, 2024.

*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**

<u>**COPIES FURNISHED TO**</u>:
Counsel of Record